**INTERNATIONAL NUTRITION, INC., Petitioner,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; Richard S. Schweiker, Secretary of the Department of Health and Human Services; Food and Drug Administration; Mark Novitch, Acting Commissioner of Food and Drugs; Joseph P. Hile, Associate Commissioner for Regulatory Affairs, Respondents.**

No. 81–1291.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 16, 1981.

Decided April 28, 1982.

*don Co.,* 383 U.S. 637, 639, 86 S.Ct. 1092, 1095, 16 L.Ed.2d 153 (1966).

William F. Baxter, Asst. Atty. Gen., Robert B. Nicholson, Mark C. Del Bianco, Dept. of Justice, Washington, D. C., for U. S. Dept. of Justice; Richard E. Geyer, Associate Chief Counsel for Veterinary Medicine, Elizabeth M. April, Asst. Chief Counsel for Veterinary Medicine Food and Drug Administration, Rockville, Md., of counsel.

Robert H. Becker, Kinsey S. Reagan, Kleinfeld, Kaplan & Becker, Washington, D. C., D. Jeff. Lance, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for Intern. Nutrition, Inc.

\* The Honorable Elmo B. Hunter, United States Senior District Judge for the Western District of Missouri, sitting by designation.

Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and HUNTER,\* Senior District Judge.

McMILLIAN, Circuit Judge.

International Nutrition, Inc. (International) appeals from an order of the Commissioner of Food and Drugs denying International's request for approval of Pig Ration Ban-250, a medicated animal feed. The Commissioner denied his approval because International had failed to follow proper agency procedure in seeking approval for the feed, which it produces. International appeals the Commissioner's decision arguing that (1) the safety and effectiveness of its feed is established and undisputed; (2) the Federal Food, Drug and Cosmetic Act provides for reference to more than one regulation in seeking approval for the use of more than one animal drug in animal feed; (3) the Food and Drug Administration's (FDA) interpretation of the relevant statute is contrary to the statute's purpose; and (4) this court should grant the requested approval rather than remand the case to the FDA. For the reasons set forth below, we affirm the decision of the Commissioner.

The Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. § 301 *et seq.*, sets out a two-step process for approving medicated animal feeds. The first step involves obtaining approval of a generally unrecognized or "new animal drug" or pre-mix.[1] The FDA decides whether to approve the new drug or pre-mix based upon a review of the New Animal Drug Application which is required to be filed under 21 U.S.C. § 360b(b). The application must contain data showing the safety and effectiveness of the new drug or pre-mix. The new drug or pre-mix can neither be manufactured nor marketed in interstate commerce without this approval. The new drug or pre-mix cannot be added to the feed then manufactured and marketed in interstate commerce in the absence of approval. The publication

1. A pre-mix is a concentrated form of the drug which is mixed with a non-drug substance for further mixing with animal feed to produce medicated animal feed.

by the FDA of the regulation is "proof" of the safety and effectiveness of the new drug or pre-mix for use in medicated animal feeds.

The second step involves obtaining approval of the feed containing the new drug or pre-mix. The animal feed may not be manufactured or marketed in interstate commerce until the feed mixer [2] applies for and receives approval to do so from the FDA under 21 U.S.C. § 360b(m)(1). An application submitted under § 360b(m)(1) must contain "an identification of the regulation or regulations (relating to the new animal drug or drugs to be used in such feed), published pursuant to subsection (i) of this section, on which he relies as a basis for approval of his application . . . ." § 360b(m)(1)(B).

After the application is filed, the FDA must either approve it or give the applicant notice of opportunity for a hearing regarding the denial within ninety days. 21 U.S.C. § 360b(m)(2).

In June 1976, International filed an application under § 360b(m)(1) for pre-marketing approval of its animal feed, Pig Ration Ban-250. The feed contains two drugs— Aureo SP–250 and Banminth. The former protects swine against worm infestation; the latter improves their weight gain and feed efficiency, and fights bacterial diseases. International seeks to manufacture and market swine feed containing the combination, arguing that it is more convenient for swine producers to use a feed containing both drugs rather than choose between feeds containing one drug or the other. Each of the drugs has been approved separately by the FDA for use in swine feed under § 360b(b). Regulations embodying the approval were published by the FDA according to statutory procedure.

In its application International referred to the two regulations approving each drug as, it argues, is possible under § 360b(m)(1)(B). International included with its application information to show that the combination of Aureo SP–250 and Banminth is safe and effective.

In July 1976, the FDA returned International's application, stating that there was no published regulation approving the combination of the two drugs which could support International's application. In November 1976, International resubmitted its application, supplementing it with extended arguments for approval based on the two regulations.

The FDA's Director of Veterinary Medicine gave notice that he proposed to deny the application because no regulation was in effect which would provide a basis for approving the use of the drugs in combination. International filed additional safety and effectiveness data with the FDA, and requested that the formal hearing to which it was entitled be dispensed with because no material facts were at issue. In January 1981, the FDA again refused to approve International's application because of the lack of a regulation upon which to base approval of the drug combination.

International appealed the Commissioner's decision under 21 U.S.C. §§ 360b(h) and 355(h), which provide for direct appeal to a United States Court of Appeals.

The central issue raised by International concerns the interpretation to be given § 360b(m)(1)(B), the section which provides that reference can be made to existing published regulations in an application for approval of animal feed. International argues that the plain meaning of the statute allows it to cite the two regulations which approve Aureo SP–250 and Banminth; the FDA argues that International is required to refer to *one* regulation which approves the combination of the two drugs.

In determining which interpretation of the statute to follow, we must consider its legislative purpose, statutory language, and the proper weight to be accorded the FDA's interpretation.

---

**2.** A feed mixer produces the medicated feeds by mixing the pre-mix with the animal feed for

sale to animal producers.

International has claimed that the FDA's interpretation of § 360b(m)(1)(B) is contrary to the purpose of the statute. The provision, as International correctly points out, is designed to avoid having feed manufacturers duplicate the drug manufacturers' experimental efforts. The feed manufacturer essentially incorporates the drug manufacturer's results and data in its application for approval for its feed under § 360b(m)(1). International argues that the purpose of § 360b(m)(1)(B) is achieved by allowing it to refer to more than one regulation because it thereby avoids duplicating drug manufacturers' efforts.

The FDA claims that International's interpretation frustrates the legislative purpose of the Act, which seeks to protect the public health. *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 246 (2d Cir. 1977). The application guidelines are designed to set up appropriate and consistent procedures to safeguard against potentially dangerous substances.

▮▮▮ An animal drug is "new" if it is not generally recognized by experts as safe and effective for its intended purpose. 21 U.S.C. § 321(w)(1). The experts' opinions must be based on adequate and well-controlled experimentation by experts for the animal drug to be generally recognized. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). A combination of animal drugs is also subject to the same test. It is a "new animal drug" unless it is demonstrated that the combination is generally recognized as being safe and effective. *United States v. An Article of Drug . . . Entrol-C Medicated*, 513 F.2d 1127 (9th Cir. 1975). International has not made such a showing; therefore it must submit an application for approval for its drug combination before it can seek approval for its new animal feed.

It has been acknowledged in the context of drugs manufactured for human use that although particular components of a drug combination may be safe and effective, the combination itself may have detrimental side effects. *United States v. X-Otag Plus*

*Tablets*, 441 F.Supp. 105, 111 (D.Col.1977); *aff'd in part*, 602 F.2d 1387 (10th Cir. 1979), and cases cited therein. It is reasonable to assume that the same holds true for animal drugs, and for that reason we decline to adopt International's interpretation of the statute.

Reading § 360b(m)(1)(B) to require International to refer to one specific regulation approving its drug combination is in harmony with the achievement of the above-stated goals. Insisting that International follow the agency's interpretation of the statute results in setting a precedent in favor of uniformity and consistency. It also aids in the regulation of drugs marketed as combinations.

The goal of reducing duplicative effort is not actually applicable to this situation. There is no evidence of duplication of effort here: there was no showing that other research concerning the safety and effectiveness of the drug combination had been done previously. International essentially attempted to turn two steps of the pre-marketing approval procedure into one. It was necessary to seek approval for the drug combination first under the New Animal Drug Application process, then request approval for the animal feed which would contain it by citing the relevant regulation. Because there was no single regulation embodying the approval of the combination of Aureo SP–250 and Banminth, International's application was rightfully rejected.

▮▮▮ Remedial legislation, such as the Act, should be given a liberal construction consistent with its statutory purpose. *United States v. An Article of Drug . . . Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969); *Grand Laboratories v. Harris*, 660 F.2d 1288, 1291 (8th Cir. 1981). In *Bacto-Unidisk*, a broad reading of the Act led to the conclusion that what would otherwise have been a "device" was actually a "drug" according to definitions included in the statute. The broad reading there was given to effect maximum protection for the public—"drugs" were regulated more strictly than "devices." We believe that adherence to the FDA's inter-

pretation will also result in maximizing protection for the public: feed manufacturers will not be permitted to rely on reference to independent regulations to support approval of a drug combination. There must be research done which demonstrates the safety and effectiveness of the drugs as used together; this research can only be submitted to the FDA under its prescribed procedures, i.e., a New Animal Drug Application must be filed for the combination.

█ An agency's construction of a statute under its enforcement jurisdiction will normally be deferred to if the construction has a reasonable basis in law and is consistent with the congressional policy behind the statute. *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *Medical Center of Independence v. Harris*, 628 F.2d 1113, 1118 (8th Cir. 1980). We do not view the FDA's reading of § 360b(m) as inconsistent with either the statute's language or the congressional policy which forms its basis for the reasons already discussed. An agency's interpretation of a relevant statute is entitled to even greater deference when the agency has participated in drafting it. *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969). The FDA played a role in developing the statute as it reads, and absent a showing that it differed with Congress or that its interpretation does not further the goals of the legislation, a court will resolve ambiguity in favor of the FDA's construction. *Id.* at 192, 90 S.Ct. at 327.

█ The courts are the ultimate authority for determining the construction to be given a statute, *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission*, 390 U.S. at 272, 88 S.Ct. at 935; *Medical Center of Independence v. Harris*, 628 F.2d at 1117, therefore, it falls to us to give the proper effect to the statute. We uphold the interpretation given by the FDA and affirm the Commissioner's decision to deny International's request for approval.